UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                                            :
HEATHER JEAN GRIFFIN                        :            3:15 CV 105(JGM)
                                            :
V.                                          :
                                            :
CAROLYN W. COLVIN,                          :
ACTING COMMISSIONER OF                      :
SOCIAL SECURITY                             :
                                            :            DATE: MARCH 7, 2016
-------------------------------------------------------- x

RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER

        This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental

Security Income ["SSI"] benefits.

I.  ADMINISTRATIVE PROCEEDINGS

        On September 20, 2010, plaintiff filed an application for DIB and SSI benefits claiming

that she has been disabled since February 27, 2002, which date was later amended to

November 19, 2007 (see Tr. 16, 299-300), due to post-traumatic stress disorder ["PTSD"],

bipolar disorder, panic disorder, and anxiety. (Certified Transcript of Administrative

Proceedings, dated March 10, 2015  ["Tr."] 160-63, 1118-24).  Plaintiff's applications were

denied initially and upon reconsideration (Tr. 1126-53; see Tr. 73-80),[1] and on May 6, 2011,

---

        [1] Previously, plaintiff was denied benefits in 2005 and 2008 under the name Heather J. Finn
(her ex-husband's last name) and later under her current name. (See Tr. 49-72, 152-59, 164-68,
1103-24).

        On November 9, 2010, counsel appeared for plaintiff. (Tr. 71-72).

plaintiff filed her request for a hearing before an Administrative Law Judge ["ALJ"].  (Tr. 81-82).  A hearing was originally scheduled for September 5, 2012 (Tr. 83-91), but then held on November 5, 2012 before ALJ William Dolan, at which plaintiff, vocational expert Richard B. Hall, and plaintiff's father, David Valimba, testified. (Tr. 1082-1102; see Tr. 92-111).  On January 9, 2013, ALJ Dolan issued his decision denying plaintiff benefits (Tr. 33-48), and on March 8, 2013, plaintiff filed a request for review of the hearing decision.  (Tr. 126).  On July 11, 2013, the Appeals Council issued an order remanding the case to the ALJ for a new hearing because the Appeals Council was unable to locate the record upon which the ALJ's decision was based, and thus was unable to determine if the decision was supported by substantial evidence. (Tr. 127-29; see Tr. 130-33).

On June 18, 2014, plaintiff, plaintiff's case manager, Meagan Devilder, and vocational expert Courtney Olds testified at a hearing before ALJ Edward F. Sweeney.  (Tr. 1044-81; see Tr. 137-51).  On July 12, 2014, ALJ Sweeney issued his decision finding that plaintiff has not been under a disability since her amended onset date of November 17, 2007. (Tr. 13-28).  On September 12, 2014, plaintiff filed her request for review of the hearing decision (Tr. 12), and on December 4, 2014, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 8-11).

On January 26, 2015, plaintiff filed her complaint in this pending action.  (Dkt. #1).[2] On April 2, 2015, defendant filed her answer (Dkt. #11), and four days later, defendant filed a copy of the two-volume, 1,153 page certified administrative transcript, dated March 10, 2015.  (Dkt. #13). On June 10, 2015, plaintiff filed her Motion to Reverse the Decision of

---

[2]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #2), which motion was granted two days later.  (Dkt. #6).

the Commissioner, with brief in support (Dkt. #16; see Dkts. ##14-15), and on August 13, 2015, defendant filed her Motion to Affirm, with brief in support. (Dkt. #17). On November 2, 2015, the parties consented to the jurisdiction of this Magistrate Judge. (See also Dkts. ##20-21).

For the reasons stated below, plaintiff's Motion to Reverse the Decision (Dkt. #16) is granted in part, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY[3]

At the time of plaintiff's hearing in November 2012, she was living at Crossroads, a residential inpatient drug treatment halfway house in New Haven, Connecticut. (Tr. 1086). At her hearing held two years later, in June 2014, she was living in "re-entry assisted community housing for individuals on parole" (Tr. 1071), as plaintiff had just been released from prison on January 30, 2014. (Tr. 1068). At that time, plaintiff was divorced, and her

_____

[3]The Court has reviewed plaintiff's earlier applications and reports to SSA in 2006 (Tr. 176-91), in which she reported that she suffers from anxiety, depression, and panic attacks, sleeps often, and receives assistance from family and friends to perform daily chores. (See also Tr. 197 (easily agitated and depressed, cannot interact with people, fears men)). In 2007, plaintiff was "run over by [her] husband[,]" after which she required medical treatment for her right leg. (Tr. 239).

Additionally, the Court has reviewed plaintiff's submissions in connection with her 2008 application (see Tr. 205-19), in which she reported that she is not "motivated" to care for herself, her fiancé performs daily chores, prepares meals, and handles personal finances, and that she suffers from bipolar disorder, PTSD as a result of domestic violence, anxiety, and panic attacks.

The Court has also reviewed plaintiff's application paperwork completed in 2010 (Tr. 252-59), at which time she was living in a "Sober House" and was attending group meetings, preparing simple meals, doing laundry, and cleaning her room. In 2011 (see Tr. 272-79), plaintiff was still living in a "Sober House[,]"(Tr. 272), did laundry, but was "[t]oo anxious" to perform most other chores, and was afraid of other people. (Tr. 275). She was hearing voices saying that they [were[ "gonna hurt [her.]") (Tr. 279; see also Tr. 272).

3

three children were ages fifteen, ten and eight. (Tr. 1051).[4]

Plaintiff testified that her family "takes [her] to do everything that [she] need[s] to do[,]" and helps her pay her expenses. (Tr. 1052).[5]  When her family is not with her, she stays in bed as she is "afraid to interact on [her] own[]" (Tr. 1061), she cannot "interact with people[]" (Tr. 1062),  she will not ride a bus because there are too many people (Tr. 1062-63),[6] and she cannot "complete tasks." (Tr. 1062).

Plaintiff testified that she has "struggled with mental health problems since [she] was a teenager[]" (Tr. 1055), and she was "beaten, strangled, and . . . was ultimately run over by [her second husband], and [was] in a coma for several weeks[.]" (Id.).  Consequently, plaintiff has "mental health problems that prevent [her] from feeling okay around people[,]" she has anxiety so she stays in bed to cope with her "problems, [and she] can't even make it to [therapy] groups that [she is] supposed to go to." (Id.).  When she does attend her group therapy sessions, she does not interact. (Tr. 1063, 1066). According to plaintiff, she spends "most of the day . . . in bed with the covers over [her] eyes." (Tr. 1056; see also Tr. 1065 (when not at therapy she is home in bed sleeping), 1091, 1093 (in November 2012, testified that she stays in bed and stays in room during social hours)).  She goes into a "mental cycle of paranoia and anxiety, and stress, and it really, it disables [her]."  (Tr.

---

[4]Plaintiff does not have custody of her children. (See Tr. 742, 747)

[5]In 2012, plaintiff's father testified that when plaintiff was living with her parents from December 2011 to April 2012, she was "incapable of taking care of herself[,]" and it was "like caring for a youngest all over again." (Tr. 1097-98).  Prior to 2012, plaintiff lived with her parents on and off when she would leave her abusive relationship in North Carolina, return, and then leave again. (Tr. 1098-99).  At one point, plaintiff left her son with her parents and returned to the abusive environment. (Tr. 1098).

[6]Plaintiff's case manager testified that when plaintiff gets on a bus, she "automatically feels . . . panic and feels as though everyone is staring at her." (Tr. 1073).

1056).  She "fear[s] people . . . are out to get [her], even in [her] home[]"  (Tr. 1091), and she has "panic attacks and drop[s] to the floor[,] . . . can't breathe," cries, and "can't complete any task[.]" (Id.).

Plaintiff's case manager, Meagan Devilder, testified at the hearing that plaintiff is "very unable to handle day to day expectations with appointments that she needs to keep." (Tr. 1070).  According to Devilder, plaintiff is "easily . . . overwhelmed with the simplest things that we would be able to do day to day."  (Tr. 1071).  She obsesses and becomes hysterical; she will "have a breakdown and [start] hysterical crying."  (Tr. 1072).[7]  Devilder explained that she performs random home visits and "often" finds plaintiff in bed.  (Tr. 1072, 1075).  If she finds her awake, they talk, but plaintiff is "panicky, hysterical crying," worried and paranoid.  (Tr. 1075).

She takes medication (see Tr. 1056-57), but she described herself as "still having trouble completing any of [her] daily goals[,]" and "still deteriorating[.]"  (Tr. 1056).  In November 2012, plaintiff reported that her medication makes her dizzy and disoriented.  (Tr. 1093-94).[8]

Plaintiff has a history of drug abuse.  (Tr. 1058-59). At the time of her hearing in June 2014, plaintiff testified that she had one relapse of cocaine use for a day in April, and

---

[7]Plaintiff described "breaking down" as something that is "out of [her] control because [she] can't work like [she] used to[,]" and she "physically and mentally cannot handle the workload anymore. So [she] just break[s] down."  (Tr. 1091).

[8]In 2008, plaintiff reported taking Seroquel and Neurontin. (Tr. 215).  In 2010, plaintiff reported taking Depakote and two doses of Seroquel. (Tr. 254).  In 2011, plaintiff reported taking Prozac, two doses of Seroquel, and Clonodine. (Tr. 274).  When she was at York Correctional Institution, she was given Effexor, Metroprolol, and Risperdone. (Tr. 237; see Tr. 292 (While at York, prescribed Trazadone and Prozac)).  In March 2014 (Tr. 289), plaintiff reported taking Trazadone, Prozac, Strovite, Lithium, Resperdal, Methadone, Klonopin, and Seroquel. (Tr. 290-91).

that she had not drank alcohol in fifteen years.  (Tr. 1057-58; <u>see also</u> Tr. 1074, 1095).[9]
Plaintiff is tested for drugs at least three times a week.  (Tr. 1075).

<u>B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS</u>

Plaintiff completed two or three years of college ( Tr.  202, 217, 1052, 1087), and
last worked "in marketing in 2003[,]" which job she had for three years.  (Tr. 1052-53; <u>but</u>
<u>see</u> Tr. 1087 (last worked in 2002 and later "worked for like two days painting" for a
neighbor)).  Plaintiff testified that she stopped working after she "was sexually harassed in
the workplace" in 2002, which was "the beginning of some problems in [her] life."  (Tr.
1054).   She testified that she was working for Manufacturers Life when that occurred. (Tr.
1090).   In that job, she took calls from brokers, did presentations "with underwriting[,]" sent
out marketing materials, and went to "luncheons with brokers to discuss" sales.  (Tr. 1088;
<u>see</u> Tr. 198, 218, 236, 244-45, 264-65). Prior to that, in 1999, she worked for Guardian Life
Insurance, which was her father's company, as a "team assistant[,]" which position she
described as "one step below a marketing rep."  (Tr. 1089; <u>see</u> Tr. 244, 246, 264, 266).
In 1998, she worked for Vocational Advancement Center as an employment consultant, or
job coach for people with physical disabilities.  (Tr. 1089-90; <u>see also</u> Tr. 198, 236, 244,
247, 264, 267).  Prior to that, she worked as a waitress. (<u>See</u> Tr. 236, 244, 248, 264, 268).

She received income through short term disability in 2002 (Tr. 349-50), and her
substance abuse issues started in 2007. (Tr. 1060).  In early 2014, plaintiff tried to search
for work but became "very overwhelmed to the point of where it made [her] physically sick
<i>and panicked</i>[,] [a]nd [she] ended up in [her] room for a couple of weeks, in . . . bed."

---

[9]According to plaintiff, she was also clean from August 1, 2009, when she went to jail,
through June 2012. (Tr. 1095).

(Tr. 1067).

The vocational expert testified that plaintiff's past work was as a sales coordinator for an insurance company, and then as an office clerk, both of which were sedentary jobs. (Tr. 1077-78).[10]   The vocational expert testified that plaintiff cannot perform any of her past work, but could perform work as a machine operator, a night cleaner, and a laundry worker, but with limitations of simple, routine, and repetitive tasks in a non-public setting.   (Tr. 1078-79).   However, if the limitations also included "a propensity to be off task, or away from the work station, or out of the work site for [fifteen] percent of a typical work day, or work week[,]" such work could not be performed.   (Tr. 1079). The same result applied if one were to be "completely absent from the work site for two days per month on average, on a [recurring] basis . . . at an unpredictable timeframe[.]" (Tr. 1079-80).

C. MEDICAL RECORDS

Plaintiff's first mental health record in the file is dated February 26, 2002, when plaintiff reported to Dr. Ali O. Erol that she "had [a] sexual harassment issue at work[.]" (Tr. 339).[11]   Plaintiff agreed to a psychiatric evaluation, and was prescribed Ativan. (Id.).[12]   In

---

[10]Similarly, the vocational expert in 2012 testified that plaintiff's past work as a "marketing representative" and as a "job coach" was sedentary work. (Tr. 1100).   In response to questioning from the ALJ, this vocational expert testified that a person with the capacity for "light work, limited to performing simple, routine tasks in a non-public contact job[,]" could perform the work of a mail sorter, retail marker, or assembly line worker.   (Tr. 1101).

In April 2008, Carly Nasser from Connecticut Department of Disability Services ["CT DDS"] opined that plaintiff could perform the work of a surveillance system monitor, laundry folder, or packer.   (Tr. 228).   In March 2009, Maryann Czaja, also from CT DDS, reached the same conclusion. (Tr. 229).

[11]There are other, unrelated, medical records in the file that the Court has reviewed.

[12]As referenced above, plaintiff applied for and received short term disability from her employer.   (Tr. 349-50).

March and then April 2002, she was prescribed Prozac (Tr. 336), and then Wellbutrin (Tr. 335) for her anxiety and depression. In August and September 2003, Dr. Erol prescribed plaintiff Lexapro and Xanax for anxiety and depression. (Tr. 331-32).

In January 2005, plaintiff received emergency treatment at St. Francis Hospital for anxiety and depression, for which she was given Torodal, Ativan and Motrin. (See Tr. 354-65; see also Tr. 381-83). In April and May 2005, plaintiff was seen for a follow up for depression, for which she was prescribed Paxil, then Lexapro, and then Wellbutrin. (Tr. 374-79). In August and September 2007, plaintiff received treatment for knee pain; plaintiff's depression and anxiety were noted in the records. (See Tr. 515, 518-19, 525-28).

As previously indicated, plaintiff amended her date of disability to November 19, 2007, the date on which she began treatment at the RiverEast Day Treatment Center at Natchaug Hospital ["RiverEast"], following a relapse of cocaine and marijuana, but she stopped attending the program on December 12, and was discharged from the program on December 19, 2007. (Tr. 477-80; see Tr. 481). Upon discharge, plaintiff had a GAF of 40, and was prescribed two doses of Seroquel, in addition to Wellbutrin, Trazadone, Hydroxyzine, and Lamictal. (Tr. 481).

In late 2007 and early 2008, plaintiff was seen at the Western Connecticut Mental Health Network (Tr. 755-63), at which time plaintiff was "very sleepy" (Tr. 755), and reported "having a meltdown[.]" (Id.). From January 21 to February 20, 2008, plaintiff was enrolled at RiverEast, following a relapse of crack cocaine and marijuana use on January 18 and 19. (Tr. 472-76). Plaintiff was admitted to a residential treatment program at Alliance Treatment Center, Inc. from February 22 to March 8, 2008, when plaintiff left "AWOL." (Tr. 482; see also Tr. 483-513). At that time, plaintiff had staples in her head from her

husband  having "run over [her] with a car[]" (Tr. 485), and was the victim of a "recent rape[.]" (Tr. 489).

In February 2008, Karen Tocher, LCSW, completed a Progress Report (Tr. 764-73) for the HERS Project at the Urban League of Greater Hartford in which she noted that during a session on February 8, 2008, plaintiff was in "moderate to severe distress[,]" and that, at that time, plaintiff was having "co-occurring issues with [s]ubstance [d]ependence and bipolar" disorder. (Tr. 764). Plaintiff reported that she was unemployed and was looking for work. (Tr. 768).

Plaintiff was admitted to Bristol Hospital from January 23 to January 27, 2009 for "severe depression, suicidal ideations, hopelessness, . . . [and] severe symptoms of opiate withdrawal." (Tr. 617; see Tr. 617-51). She was initially assigned a GAF score of 25 (Tr. 620), and upon discharge, she was assigned a GAF score of 40. (Tr. 617).

On June 2 and 3, 2009, plaintiff was seen at the Bristol Hospital Emergency Room (Tr. 568-616) with suicidal ideation and a need for detoxification. (See Tr. 568). Plaintiff was "very depressed[,]" and she was assigned a GAF score of 25. (Tr. 576; see also Tr. 604). It was noted that "patient has a chronic history of depression, opiate dependency, poor support systems, [and] multiple losses." (Id.). Plaintiff returned to Bristol Hospital two months later, on August 3, 2009, complaining of "feeling suicidal." (Tr. 573-74). When the medical staff attempted to discuss detoxification options with her, she "disavowed suicidal ideation" and security was called when plaintiff attempted to have a male patient in an adjacent room leave with her; plaintiff then left without any further treatment. (Id.). Thereafter, plaintiff was incarcerated for one year, from 2009 through 2010, for burglary. (Tr. 1068, 1095; see also Tr. 740).

9

When she was released on probation, plaintiff began treatment at the Community Mental Health Affiliates ["CMHA"] on September 15, 2010 (Tr. 738-49); she was diagnosed with PTSD, cocaine dependence and heroin dependence.  (Tr. 748-49; see also Tr. 736-37). On September 23, 2010, plaintiff presented anxious and hyper vigilant; Michelle Litwin, APRN, one of plaintiff's treating providers at CMHA, prescribed Depakote and two doses of Seroquel. (Tr. 735). A week later, plaintiff was crying during her appointment. (Tr. 734). Plaintiff returned on October 19, 2010, at which time she admitted that she was depressed when she sees pictures of her children who no longer live with her.  (Tr. 731).   On November 2, 2010, plaintiff reported to APRN Litwin that Seroquel "works great!"  (Tr. 730). She found the medication "helpful" and it "organize[d] [her] thoughts."   (Id.).   On November 16, 2010, plaintiff reported that she is bipolar and has PTSD and was "having [a] hard time[.]" (Tr. 729).  On December 3, 2010, Dr. Margaret Chaplin at CMHA noted that plaintiff has had "anxiety all her life – wakes up anxious and begins ruminating [and is] overwhelmed by simple decisions[.]" (Tr. 728).   Plaintiff was assessed as having a "[c]omplex case of severe anxiety which is debilitating[,]" and Dr. Chaplin noted that plaintiff was "so severely anxious[.]"   (Id.). At that time, plaintiff was "clean [and] sober."   (Id.).

On December 8, 2010, plaintiff was treated at the Emergency Room of the Hospital of Central Connecticut, New Britain General for an overdose of Xanax, after she was found face down at the side of (Tr. 653), or in the bathtub. (Tr. 661, 666; see Tr. 653-64). Plaintiff was admitted in-patient until December 13, 2010 (Tr. 665-89), during which time she was diagnosed as bipolar, manic, with psychosis, and a history of polysubtance abuse dependence including cocaine, opiates, marijuana, and benzodiazepines.  (Tr. 665). Plaintiff was "extremely manic, hyperverbal, [and] very tangential[;]" she was restarted on

Seroquel, and Topamax.  (Tr. 666).[13] On December 22, 2010, plaintiff returned to CMHA reporting that she has been "dealing [with] anxiety really bad[.]" (Tr. 727).  Six days later, plaintiff's anxiety was "out of control" and she reported that she had blacked out in the bathtub.  (Tr. 726).  She was "distressed" and she was prescribed Clonidone, and restarted on Seroquel.  (Id.).

On January 3 and 5, 2011, plaintiff returned to CMHA for medication refills (Tr. 724-25), and on January 24, 2011, plaintiff was "constantly sad[,]" "thinking about the children[,]" anxious, "nervous about change[,]" and unable to watch television.  (Tr. 723). APRN Litwin noted that plaintiff was not compliant with her medications.  (Id.).  Plaintiff was prescribed Geodon (id.), and on February 21, 2011, reported that it was "really help[ing] [with] the anxiety[,]" although she also reported that her "social anxiety is out of control[.]" (Tr. 722).  She was feeling overwhelmed and depressed, and presented anxious and tearful when discussing her children.  (Id.).  On February 28, 2011, Geodon was discontinued.  (Tr. 721).  Plaintiff was seen on March 24, 2011 at CMHA by Theresa Clark, LMFT, for anxiety. (Tr. 720).  At that time, it was noted that she was "clean [and] sober."  (Id.).  On April 18, 2011, plaintiff reported to APRN Litwin at CMHA that she was "having [a] hard time leaving the house[.]" (Tr. 719).  Plaintiff was seen five times in the month of May 2011 (Tr. 712, 715-18) by her treating psychiatrist at CMHA, Dr. Tadeusz Rachwal, or by Clark for anxiety; she reported that she was experiencing insomnia, was anxious, and was "extremely angry . . . ." (Tr. 712).  On June 2, 2011, plaintiff reported to Clark that her new medications were working "really well." (Tr. 710).  When plaintiff was seen by Dr. Rachwal on June 30, 2011,

---

[13]Around the same time, plaintiff was treated for Hepatitis C, headaches, and other unrelated medical issues at the Community Health Center, Inc. by Amanda Swan, APRN.  (Tr. 784-90; see Tr. 774-83; see also Tr. 791-848 (corresponding emergency room records)).

she was anxious and paranoid, and had a "worsening of panic." (Tr. 708). On August 1, 2011, Clark noted that plaintiff was anxious, and had poor impulse control and poor judgment. (Tr. 704-07). On September 19 and October 5, 2011, plaintiff returned to Clark, during which appointments her anxiety was discussed. (Tr. 903-10). On October 12, 2011, Clark noted that plaintiff had excessive and/or unrealistic worry that was difficult to control and that occurred more days than not for a period of at least six months. (Tr. 894-902). Plaintiff was seen by Dr. Rachwal for medication management on December 8, 2011 (Tr. 890-93), and on December 19, 2011, plaintiff reported to Clark that she was anxious because her boyfriend was returning to jail. (Tr. 886-89).

On January 23, 2012, Clark noted plaintiff's diagnoses as PTSD, polysubstance dependence in early full remission, and borderline personality disorder (Tr. 859, 876), and a treatment plan was formulated to help plaintiff "reduce overall anxiety and manage anxiety symptoms." (Tr. 860, 877; see also Tr. 861-62, 878-85). Plaintiff was seen by Clark for therapy on March 14, 2012 (Tr. 872-75), and the next day, plaintiff was seen by Dr. Rachwal (Tr. 868-71) during which appointment plaintiff reported hearing voices telling her that her ex-husband was going to hurt her. (Tr. 869). Plaintiff's mood was sad and frustrated, and she was crying. (Id.). At that time, plaintiff was taking Clonidine, Lithium, Trazodone, Risperidone, and Vistaril. (Id.; see also Tr. 911-12). From April 23 to July 22, 2012, plaintiff was seen by Clark on an outpatient basis, during which appointments Clark worked to teach plaintiff "to effectively cope with the full variety of life's anxieties." (Tr. 860; see also Tr. 859-64, 865-67 (plaintiff "[c]ried a[]lot[]" through the appointment on 5/23/12)). In June 2012, Clark saw plaintiff and her boyfriend for couple's therapy and addressed plaintiff's anxiety with the goal of "[r]educ[ing] [the] overall frequency, intensity,

12

and duration of the anxiety so that [plaintiff's] daily functioning is not impaired." (Tr. 857; see Tr. 855-58).

Plaintiff was admitted for inpatient treatment at Bristol Hospital from July 9 to July 12, 2012 for bipolar disorder, mixed type with depression, polysubstance dependency disorder including opiates and cocaine, and personality disorder, and she was assigned a GAF score of 40. (Tr. 913, 921; see Tr. 913-25). Plaintiff reported that she had stopped taking her medications, was abusing heroin and crack cocaine, and had attempted to kill herself. (Tr. 913, 915, 920).

While incarcerated, or on parole, between December 8, 2012 and January 14, 2014, plaintiff received treatment from the Connecticut Department of Correction, UConn Correctional Managed Health Care, through York Correctional Institute. (See Tr. 943-1026). In her Initial Psychiatric Evaluation on December 8, 2012, plaintiff was diagnosed with mood disorder, was in a state of detoxification (see Tr. 990), and was prescribed Lithium and Seroquel. (Tr. 992; see Tr. 1014). In her second Initial Psychiatric Evaluation, dated November 7, 2013, plaintiff was diagnosed with cocaine and opioid dependence, mood disorder, and PTSD, and she was prescribed Prozac and Trazadone. (Tr. 957). Over the course of her incarceration, she was given Lithium and Doxepin (Tr. 1012), Trazadone (Tr. 993, 970), Prozac and Buspar (Tr. 1020), or Prozac and Trazadone. (Tr. 995, 997, 1017, 1019). On October 4, 2012, plaintiff entered Crossroads, Inc., following her period of incarceration for a violation of probation[14] and prostitution. (Tr. 929-33; see Tr. 926). Plaintiff was assessed for bipolar disorder, PTSD, anxiety with disabling panic attacks and

_____

[14]The probation violation relates to plaintiff's previous incarceration for burglary. (Tr. 929, 1024, 1068-69).

agoraphobia, obsessive compulsive disorder ["OCD"], and substance dependency.  (Tr. 929, 933).  Plaintiff's mood was dysphoric, constricted, sad, agitated, and anxious with "worry [and] panic, [and acting] on the defensive[]" and "[a]ll over the place."  (Tr. 932).  She felt hopelessness and worthlessness, and reported that she felt "people are out to get [her] — mentally instead of physically."  (Id.).  Dr. Nabyl Tejani noted that plaintiff had multiple inpatient psychiatric admissions in her teens and 20s for suicidal ideation and manic episodes.  (Tr. 927-28).  His impression was that plaintiff suffers from bipolar disorder versus substance-induced mood disorder, heroin and cocaine dependence, and he assigned her a GAF score of 55.  (Tr. 926).

Plaintiff began treatment at the Community Renewal Team, Inc. ["CRT"] on February 11, 2014, and was seen on March 6, 2014 on an emergency basis by Mohinder Chadha, MD, when she was in a "manic state[.]" (Tr. 1037).  On March 13, 2014, Dr. Chadha performed a Psychiatric Evaluation in which he noted plaintiff's "extensive" history of bipolar disorder and manic episodes since she was fourteen or fifteen years old, noting that she was "hospitalized frequently since that time." (Tr. 1036). According to Dr. Chadha, when he saw plaintiff the previous week she was exhibiting "classic[]" symptoms of a manic state.  (Id.).  Her speech was pressured with a "flight of ideas[] [and] poor concentration, [she was] very excitable, [and] suspicious of friends' motives." (Id.).  On March 27, 2014, plaintiff reported that she was "doing much better on the medications." (Tr. 1035).  Her mood was "calmer[] [and] becoming productive."  (Id.).  She was taking Lithium Carbonate, Risperdal, and Artane. (Id.). On April 11, 2014, plaintiff tested positive for cocaine, she had not taken her Risperdal or Artane for a "few days[,]" and she was "very restless" and "hyper[.]" (Tr. 1034).  On April 28, 2014, plaintiff's mood was "evidence[d] by difficulties

with periods of high energy, racing thoughts, difficulties sitting still, depression, anxiety, and difficulty concentrating." (Tr. 1032). She was not on medication at that time. (Id.). Her primary diagnoses were bipolar disorder, single manic episode, PTSD, and opioid abuse. (Id.). The next day, plaintiff was still feeling hyper, restless, and unable to concentrate. (Tr. 1031). On May 13, 2014, she was doing better on Buspar, was less anxious and excitable, and was compliant with her medication regime. (Tr. 1029). On May 19, 2014, plaintiff was "still struggling with chronic mental health issues as well as ongoing issues with cocaine, marijuana, and opioids." (Tr. 1027-28). She reported "ongoing problems with high energy, racing thoughts, difficulties sitting still, depression, anxiety, and difficulty concentrating[,]" but her "medications [were] assisting to manage them." (Tr. 1027).

<u>D. MEDICAL OPINIONS</u>

On January 6, 2006, plaintiff underwent a Disability Evaluation by Dr. Anthony G. Carraway for the North Carolina Department of Health and Human Services. (Tr. 398-402). Dr. Carraway found plaintiff's mood to be "chronically depressed[]" (Tr. 399), and he found that her ability to understand, retain and perform instructions was "minimally impaired[,]" while her persistence was "somewhat mildly to moderately impaired[,]" and her stress tolerance was "moderately poor[,]" with her "primary area of difficulty . . .  in the interpersonal realm." (Tr. 401).

On February 1, 2006, Susan Stevens-Pickett, Psy.D, completed a Mental Residual Functional Capacity Assessment of plaintiff in which she found plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday or workweek, to interact appropriately

with the general public, and to respond appropriately to changes in the work setting. (Tr. 403-05). On the same day, Dr. Stevens-Pickett also completed a Psychiatric Review Technique (Tr. 407-20) in which she noted mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 417).

On June 26, 2006, Mitchel Rapp, Ph.D., completed a Mental Residual Capacity Assessment of plaintiff (Tr. 453-55), in which he found that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for an extended period, perform activities within a schedule, maintain regular attendance, and be punctual, complete a normal workday and workweek, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers, respond appropriately to changes in the work setting, and travel in unfamiliar places. (Tr. 453-54). Additionally, plaintiff was markedly limited in her ability to interact appropriately with the general public. (Tr. 454). According to Dr. Rapp, plaintiff has the ability to understand and remember at least simple instructions, sustain concentration to complete a variety of simple tasks, and adapt to routine work demands with a variety of simple tasks. (Tr. 455). Dr. Rapp also concluded that plaintiff's "[s]ocial functioning is her weakest area[,]" and her "personality disorder most significantly impacts on function." (Id.).

The same day, Dr. Rapp completed a Psychiatric Review Technique (Tr. 458-71) in which he concluded that plaintiff has moderate restrictions in activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 468). Dr. Rapp noted that plaintiff's mother reported that plaintiff "spends a lot of time sleeping due to depression." (Tr. 470).

On April 17, 2008, plaintiff underwent a consultative examination (Tr. 529-33) by Dr.

16

Yacov Kogan from CT DDS  in which he noted plaintiff's generalized pain since her husband "reportedly ran his truck over her body with resultant loss of consciousness and subsequent hospitalization[,]" as well as a history of bipolar disorder, anxiety, panic disorder, and PTSD. (Tr. 529).  Plaintiff reported memory and concentration difficulties, panic attacks three times daily, episodes of irritability, sleeplessness, and racing thoughts, however, on examination, Dr. Kogan noted good long and short term memory, and good concentration. (Tr. 529, 531).

Five days later, on April 22, 2008, Jay M. Cudrin, Ph.D., completed a consultative examination (Tr. 534-36) of plaintiff for CT DDS in which he noted that plaintiff was "an emotionally fragile woman who cried frequently as she talked about her history."  (Tr. 534). Dr. Cudrin noted that plaintiff "reacted to abuse from her alcoholic parents by cutting her arms for attention and kicking holes in the walls[,]" and she received psychiatric treatment as a sophomore in high school. (Tr. 535).  Plaintiff "exuded depressive feelings[,]" and reported that she does not want to be out in public.  (Id.).  She was distraught about losing custody of her children, and she has frequent nightmares and flashbacks about traumas and abuse.  (Id.).  She also reported frequent panic attacks with hyperventilation, loss of breath, and feelings like she was spinning.  (Id.).  At that time, her mother handled her daily chores, and plaintiff "spent a lot of time covered up in blankets in bed."  (Id.).  Dr. Cudrin noted plaintiff had trouble with short-term memory, and he assigned her a GAF of 25, "if claimant is telling the truth about herself."  (Tr. 535-36).

On April 30, 2008, Dr. Timothy Schumacher completed a Mental Residual Functional Capacity Assessment (Tr. 537-40) of plaintiff in which he opined that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain

attention and concentration for extended periods, to complete a normal work day and work week without interruptions from psychologically based symptoms, and to interact appropriately with the general public.  (Tr. 537-38).  Dr. Schumacher noted that plaintiff's drug abuse was in remission and the file reflected a "longitudinal pattern reflective of borderline [personality] with periodic mood and anxiety reactions."  (Tr. 540).  He concluded that plaintiff's adaptive skills are "intact for simple work adjustments."  (Id.).

In a Psychiatric Review Technique (Tr. 541-54) completed the same day, Dr. Schumacher concluded that plaintiff has moderate difficulties maintaining social functioning, concentration, persistence or pace, and has had one or two episodes of decompensation. (Tr. 551).  Also on April 30, 2008, Dr. Stephen F. Heller completed a Case Analysis of plaintiff in which he reviewed Dr. Kogan's findings (Tr. 555), and on reconsideration, Dr. Nathaniel Kaplan repeated Dr. Heller's finding that plaintiff has non-severe physical impairments. (Tr. 565).

In a Case Analysis dated March 2, 2009, Russell Phillips, Ph.D., concluded that plaintiff's limitations are attributed to anxiety and depression but that her addictions and their contribution to her anxiety have not been considered.  (Tr. 567).

On September 23, 2010, a Psychiatric Assessment was completed by APRN Litwin of CMHA (Tr. 750-52) in which plaintiff reported that she has been "crying up a storm and crying constantly[.]" (Tr. 750).   She was anxious and hyper and had flashbacks and nightmares.  (Tr. 750-51).

On March 31, 2011, Dr. Kogan completed a second consultative examination (Tr. 693-96) of plaintiff in which he noted plaintiff's history of "chronic, daily, generalized" head pain, frequent photophobia, and nausea, as well as a history of bipolar disorder, currently

18

managed on Seroquel, a history of PTSD, and five psychiatric hospitalizations.   (Tr. 693, 695).   Additionally, plaintiff reported a depressed mood, crying spells, poor sleep and poor appetite, as well as frequent racing thoughts.   (Id.).

On April 15, 2011, Marc Hillbrand, Ph.D., completed a consultative examination (Tr. 697-700) of plaintiff in which he noted plaintiff's report that her mental health treatment history started at age fifteen, she has had four psychiatric hospitalizations and four episodes of detox.   (Tr. 697).   She reported use of crack cocaine, heroin, and ecstasy.   (Id.).   Dr. Hillbrand concluded that it was difficult to assess plaintiff's cognitive status in light of her response style, her verbal presentation was suggestive of intact cognitive abilities, and her response style makes it difficult to assess her severity of psychopathy. (Tr. 699).

On March 19, 2012, plaintiff's therapist, Theresa Clark from CMHA, completed a Mental Impairment Questionnaire, which was co-signed by Dr. Rachwal.   (Tr. 849-54). Plaintiff's diagnoses were PTSD, polysubstance abuse in remission, and borderline personality. (Tr. 849).   Plaintiff "often misse[d] appointments due to being afraid to leave her home[,]" she was "visibly anxious" in the session, and she would "often cr[y] throughout the entire session."   (Id.).   Her prognosis was "poor[.]" (Id.).   Plaintiff was assessed as having anhedonia, decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, change in personality, paranoid thinking, recurrent obsessions or compulsions, substance dependence in remission, persistent irrational fear, intense and unstable relationships, perceptual or thinking disturbances, hyperactivity, emotional lability, deeply ingrained, maladaptive patterns of behavior, illogical thinking, vigilance and scanning, pathologically inappropriate suspiciousness, easy distractibility,

19

memory impairment, sleep impairment, oddities of thought, recurrent severe panic attacks, and involvement in activities that have a high probability of painful consequences. (Tr. 850).

According to plaintiff's treating providers, she has a "very difficult time meeting deadlines due to inability to remain consistently focused[.]" (Tr. 851). Plaintiff "cannot handle criticism[,]" has "daily panic attacks[,]" and her "symptoms appear daily which would make a normal work week impossible." (Id.). Plaintiff was assessed as "[l]imited but satisfactory" in her ability to remember work-like procedures, understand, remember and carry out short simple instructions, and ask simple questions or request assistance. (Id.). She is "[s]eriously limited" in her ability to maintain attention for a two hour segment, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, make simple work-related decisions, get along with co-workers, and deal with normal work stress. (Id.). Additionally, she was assessed as "[u]nable to meet competitive standards" in her ability to maintain regular attendance and be punctual, complete a normal workday or workweek, perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work settings, and be aware of normal hazards and take appropriate precautions. (Id.).

Plaintiff "has a difficult time multi[-]tasking or changing from one task to another without it causing her extreme stress[,]" and she is "[s]eriously limited" in her ability to understand, remember, and carry out detailed instructions, set realistic goals, and deal with the stress of semiskilled or skilled work. (Tr. 852). Plaintiff has "extreme social phobia and is unable to use public transportation without having a panic attack[,] esp[ecially] when in an unfamiliar place[,]" and she is "[s]eriously limited" in her ability to maintain socially appropriate behavior. (Id.). She is "[l]imited but satisfactory" in her ability to interact with

20

the general public and adhere to basic standards of neatness and cleanliness.  (Id.).

According to Dr. Rachwal and Clark, plaintiff has "[m]arked" limitations in her activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace, and has had one or two episodes of decompensation.  (Tr. 853).  Additionally, plaintiff would be absent from work "[m]ore than four days per month[,]" and she has "intrusive thoughts and sleep disturbances due to PTSD."  (Tr. 854).  Clark and Dr. Rachwal acknowledged that plaintiff "often uses drugs to help deal [with] her [symptoms,]" plaintiff becomes "even more anxious [because] of relapse[,]" and plaintiff "would still experience [the] same symptoms at [the] same levels even if totally abstinent."  (Id.).

On November 24, 2012, Billings Fuess, PhD, completed a Medical Interrogatory-Mental Impairment(s) – Adult form, and a Medical Source Statement of Ability to do Work-Related Activities (Mental) (Tr. 935-42) in which he noted the existence of PTSD, polysubstance dependence, heroin abuse, cocaine abuse, benzodiazepine abuse, borderline personality disorder, anxiety with panic attacks, OCD, bipolar disorder, and major depression disorder. (Tr. 935).  He opined that plaintiff has moderate restrictions in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace, and has mild episodes of decompensation.  (Tr. 936).  He noted that plaintiff has limitations in her ability to tolerate and manage stress even while abstaining from drugs and alcohol.  (Tr. 939).  According to Dr. Fuess, plaintiff "should be capable of following, understanding[, and] completing tasks that have simple instructions.  Due to her poor stress tolerance coping capacity[,] the work environment will need to be routine, repetitive types of tasks."  (Id.).  Additionally, "limited contact [with] the public is suggested due to impulsivity and mood instability." (Id.).

Dr. Fuess found that, due to plaintiff's anxiety, mood fluctuations, depression and substance abuse, plaintiff has mild restrictions in her ability to understand and remember simple instructions, and to make judgments on simple work-related decisions, mild-to-moderate restrictions in her ability to carry out simple instructions, moderate restrictions in her ability to understand and remember complex instructions, and marked restrictions in her ability to carry out complex instructions and make judgments on complex work-related decisions. (Tr. 940). Similarly, he found that plaintiff has moderate restrictions in her ability to interact appropriately with the public and co-workers, and to respond appropriately to usual work situations. (Tr. 941). Plaintiff's substance abuse "adversely impacts [her] mood stability and anxiety[,]" and her "episodes of decompensation (hospitalizations) [are] associated [with] substance abuse[.]" (Id.).

On June 17, 2014, Dr. Mohinder Chadha of CRT completed a Mental Impairment Questionnaire (Tr. 1038-43) in which he noted that plaintiff's symptoms included anxiety, excitability, feeling hyper, restless, and unable to concentrate, and her prognosis was guarded. (Tr. 1038). According to Dr. Chadha, plaintiff has impairment in her impulse control, bipolar syndrome, intense and unstable interpersonal relationships and impulsive behavior, hyperactivity, emotional lability, flight of ideas, manic syndrome, pressure of speech, easy distractibility, and sleep disturbance. (Tr. 1039). Dr. Chadha opined that plaintiff is seriously limited in her ability to carry out very short and simple instructions, and is unable to meet competitive standards in any other of the fifteen categories assessed for unskilled or semiskilled and skilled work. (Tr. 1040-41). Additionally, according to Dr. Chadha, plaintiff is "[s]eriously limited" in her ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public

22

transportation; plaintiff is also "[u]nable to meet competitive standards" to understand, remember and carry out detailed instructions, set repetitive goals or make plans independently of others, and deal with the stress of semiskilled and skilled work.  (Tr. 1041). He opined that she has marked restriction of activities of daily living, marked difficulties maintaining social functioning, and marked difficulties maintaining concentration, persistence or pace, and has had three episodes of decompensation.  (Tr. 1042).  Additionally, according to Dr. Chadha, plaintiff would be absent from work four or more days per month. (Tr. 1043).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.  Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)(quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the

entire record to determine the reasonableness of the ALJ's factual findings.   See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

## IV.  DISCUSSION

Following the five step evaluation process,[15] ALJ Sweeney found that plaintiff has not engaged in substantial gainful activity since November 19, 2007.  (Tr. 18, citing 20 C.F.R. §§ 404.1571 et seq. and 416.971 et seq.).  ALJ Sweeney then concluded that plaintiff has the following severe impairments: polysubstance abuse, bipolar disorder, PTSD, borderline personality disorder and panic disorder (Id., citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19-21, citing 20 C.F.R. §§ 404.1520(d), 404.1525,

---

[15]Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. § 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work.  See 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

404.1526, 416.920(d), 416.925 and 416.926).   In addition, at step four, "[a]fter careful consideration of the entire record," ALJ Sweeney found that plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine repetitive tasks in a nonpublic setting with no more than occasional contact with coworkers and supervisors.  (Tr. 21-26).   The ALJ concluded that plaintiff is unable to perform any past relevant work (Tr. 26, <u>citing</u> 20 C.F.R. §§ 404.1565 and 416.965), however, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  (Tr. 27-28, <u>citing</u> 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).   Thus, the ALJ concluded that plaintiff has not been under a disability from the amended onset date of November 17, 2007, through the date of his decision.  (Tr. 28, <u>citing</u> 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ's decision is "erroneous in assigning 'greatest weight' to the opinion of a non-examining physician, 'substantial weight' to the opinions of single visit consultative examiners, and the least weight to treating physicians, and by failing to follow the treating physician rule."  (Dkt. #16, Brief at 12-25).  Plaintiff also contends that the ALJ erred by failing to find, at Step 3, that plaintiff meets one or more mental health Listings based on the assessments of the treating physicians (<u>id.</u> at 25-28); the ALJ erred by considering the impacts of drug and alcohol abuse when making the primary assessment of limitations, rather than first finding disability and only then considering the materiality of drug addiction or alcoholism (<u>id.</u> at 28-33); the ALJ's decision is erroneous in its consideration of medication non-compliance as contributing to her inability to work (<u>id.</u> at 33-35); and the ALJ's decision failed to include all impairments and limitations as required by Social Security Ruling 96-8p, resulting

25

in a residual functional capacity assessment that is not supported by the record, thereby rendering the vocational expert's opinion that was endorsed by the ALJ, insufficient to satisfy the Commissioner's burden at Step Five. (Id. at 35-38).

Defendant asserts that the ALJ properly evaluated plaintiff's mental impairments using the "special technique" when assessing plaintiff's mental impairment (Dkt. #17, Brief at 4-9); the ALJ properly considered the medical opinions in the record (id. at 9-14); the ALJ properly considered the impact of drug and alcohol abuse in assessing plaintiff's disability (id. at 14-15); and the ALJ properly considered evidence of plaintiff's non-compliance with recommended treatment and his Step Five decision is supported by substantial evidence (id. at 15-18).

A. TREATMENT OF THE MEDICAL OPINIONS OF RECORD

In considering which medical evidence to rely on, an ALJ must treat "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments [a]s binding if it is supported by the medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013), citing, inter alia, Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); see 20 C.F.R. § 404.1527(c)(2)("If [an ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight").  If an ALJ decides not to give the treating physician's opinion controlling weight, the ALJ will consider the following factors in assigning a lesser weight to the opinion:

(i) the frequency of examination and the length, nature and extent of the

26

treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004), citing 20 C.F.R. § 404.1527(c), formerly 20 C.F.R. § 404.1527(d)(2).

In his decision, the ALJ "did not adopt the opinions" of plaintiff's treating providers, noting that their opinions were inconsistent with the underlying treatment records and "were not supported by their assigned global assessment of functioning scores." (Tr. 21; see Tr. 25-26). When a treating physician's opinion is not given controlling weight, as in this case, "the regulations direct the ALJ to explain in the decision the weight given to the opinions of nonexamining state agency consultants, treating sources, nontreating sources, and other nonexamining sources." Domm v. Colvin, 579 F. App'x 27, 28 (2d Cir. 2014)(summary order), citing 20 C.F.R. § 404.1527(e)(2)(ii). In his decision, the ALJ acknowledges that plaintiff received "medication management and counseling at [CMHA] since September 2010[]" (Tr. 20), but concluded that he "did not adopt the opinion[] of Theresa M. Clark, a licensed marriage and family therapist at [CMHA][,]" as her opinion was "inconsistent with the information in [her] treatment records, which indicated that [plaintiff's] mental functioning improved when she was medication compliant and [the opinion] was not supported by [the] assigned [GAF] score of 50[.]" (Tr. 21).

As an initial matter, Clark, as a licensed marriage and family therapist, is not an "acceptable medical source" whose medical opinion can be afforded controlling weight. Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006). However, the opinions of "other medical sources," which include therapists, are "important and should

be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file." Id. at *3.[16]

The Mental Impairment Questionnaire completed by Clark was co-signed by Dr. Rachwal. This is important, and it is a fact that the ALJ did not consider. Beckers v. Colvin, 38 F. Supp. 3d 362, 372 (W.D.N.Y. 2014), citing Santiago v. Barnhart, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006)("[T]here is no reason to believe that the report Nunez signed does not reflect his own view. Nor is there any legal principle which states that a doctor must personally write out a report that he signs for it to be afforded weight. Since Nunez signed his name to the report and there is no evidence indicating that the report does not represent his opinion, the ALJ erred in discounting Nunez's opinion on this basis alone."); Keith v. Astrue, 553 F. Supp. 2d 291, 301 (W.D.N.Y. 2008)(directing that on remand, the ALJ evaluate treatment notes drafted by a nurse practitioner and co-signed by a physician in accordance with the treating physician rule).   This is not a case in which there is no evidence that the co-signing psychiatrist ever personally examined the plaintiff or had an ongoing treatment or a physician-patient relationship.[17]   Dr. Rachwal was plaintiff's treating psychiatrist at CMHA. (See Tr. 708, 712, 716, 868-71, 890-93).   Yet, the ALJ does not

---

[16]SSR 06-03p directs the application of the same factors used to evaluate "acceptable medical sources[,]" namely, the length of the treating relationship and how frequently the source has seen the individual, the degree to which the opinion is consistent with other evidence in the record, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the individual's impairments, and any other factors that tend to support or refute the opinion. Id. at *4.

[17]Lopez Nunez v. Colvin, No. 14 CV 488 (JBA)(JGM), slip op., at 24 (D. Conn. Oct. 20, 2015), citing Perez v. Colvin, No. 13 CV 868 (HBF), 2014 WL 4852836, at *26 (D. Conn. Apr. 17, 2014), approved & adopted, 2014 WL 4852848 (D. Conn. Sept. 29, 2014), citing Vester v. Barnhart, 416 F.3d 886, 890 (8th Cir. 2005)("Where, as here, an [APRN] opinion is cosigned by a [physician], but there are no records or other evidence to show that the [physician] treated [the claimant], the APRN's opinion does not constitute the opinion of the physician."); see also Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011)(ALJ did not err in refusing to find physicians' opinions controlling, due to the physicians' "limited and remote contact" with the claimant).

mention Dr. Rachwal at all  in his discussion, let alone  explain  why  Dr. Rachwal's opinion is rejected.  Beckers, 38 F. Supp. 3d at 372 ("particularly because the evaluation was co-signed by [the doctor], it was legal error for the ALJ to entirely disregard the opinion[]")(citations omitted).

Consistent  with  the  treatment  records  from  CMHA  and  Dr. Chadha's records, plaintiff's case manager testified that plaintiff is "very unable to handle day to day expectations  with  appointments  that  she  needs  to  keep[]"  (Tr. 1070); plaintiff is "easily overwhelmed with the simplest things that we would be able to do day to day[]" (Tr. 1071); and plaintiff obsesses and becomes hysterical. (Tr. 1072).  Similarly, Clark and Dr. Rachwal opined  that  plaintiff  has  a  "very  difficult  time  meeting  deadlines  due  to  inability  to  remain consistently  focused[.]"  (Tr. 851).   They  found  that  plaintiff  "cannot  handle  criticism  in  any form[,]"  has  "daily  panic  attacks[,]"  and  her  "symptoms  appear  daily  which  would  make  a normal  work  week  impossible."   (Id.).   Additionally,  plaintiff  "has  a  difficult  time  multi[-]tasking or  changing  from  one  task  to  another  without  it  causing  her  extreme  stress[,]"  and  she  is "[s]eriously  limited"  in  her  ability  to  understand,  remember,  and  carry  out  detailed instructions,  set  realistic  goals,  and  deal  with  the  stress  of  semiskilled  or  skilled  work.   (Tr. 852).   In  their  opinion,  plaintiff  has  "extreme  social  phobia  and  is  unable  to  use  public transportation  without  having  a  panic  attack[,]  esp[ecially]  when  in  an  unfamiliar  place[,]" and  she  is  "[s]eriously  limited"  in  her  ability  to  maintain  "socially  appropriate  behavior[,]"  and she  is  "[l]imited  but  satisfactory"  in  her  ability  to  interact  with  the  general  public  and  adhere to  basic  standards  of  neatness  and  cleanliness.  (Id.).[18]   The  foregoing  opinions  are

_____

[18]Moreover, as to the issue of plaintiff's substance abuse, Clark and Dr. Rachwal acknowledged that plaintiff "often uses drugs to help deal [with] her [symptoms,]" plaintiff becomes "even more anxious [because] of relapse[,]" and plaintiff "would still experience [the] same

consistent with Dr. Chadha's opinions that plaintiff is seriously limited in her ability to carry out very short and simple instructions, is unable to meet competitive standards in any other category assessed for unskilled or semiskilled and skilled work, is "[s]eriously limited" in her ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation, and has marked restriction of activities of daily living, has marked difficulties maintaining social functioning, and has marked difficulties maintaining concentration, persistence or pace. (Tr. 1040-42).[19]

These assessments, which the ALJ rejected as inconsistent with the underlying treatment records, are, in fact, consistent not only with records of these treating providers, but with other evidence in the record.  Plaintiff received consistent and regular treatment at CMHA over at least a two year period. These records detail plaintiff's history of what Dr. Rachwal described as "severe anxiety" (Tr. 716; see also Tr. 735, 860, 877, 903-10), in addition to plaintiff's poor judgment and poor impulse control (Tr. 704-07), excessive and unrealistic worry that was occurring "more days than not" (Tr. 894-902), and crying episodes. (See Tr. 734, 869; see also Tr. 865-67 (plaintiff "[c]ried a[]lot[]" through the appointment)). Plaintiff's treating providers noted in the Mental Impairment Questionnaire that plaintiff "often misse[d] appointments due to being afraid to leave her home[,]" she had a poor prognosis, she was "visibly anxious" in the session, and she would "often cr[y] throughout the entire session." (Tr. 849).  This finding is also consistent with the testimony

---

symptoms at [the] same levels even if totally abstinent." (Tr. 854).  Yet, this too, is not addressed by the ALJ.

[19]These opinions are also consistent with plaintiff's testimony that when her family is not with her, she stays in bed as she is "afraid to interact on [her] own[]" (Tr. 1061), she cannot "interact with people" (Tr. 1062),  she will not ride a bus because there are too many people (Tr. 1062-63), and she cannot "complete tasks." (Tr. 1062).

of plaintiff's case manager that when she performs random home visits, she "often" finds plaintiff in bed,[20] and if she finds her awake, plaintiff is "panicky, hysterical crying," worried and paranoid. (Tr. 1072, 1075). Similarly, this is consistent with APRN Litwin's Psychiatric Assessment in which noted that plaintiff had been "crying up a storm and crying constantly[,]" she was anxious and hyper, and she had flashbacks and nightmares. (Tr. 750-51). Additionally, Clark and Dr. Rachwal's opinion that plaintiff would be absent from work "[m]ore than four days per month[]" is consistent with Dr. Chadha's assessment (Tr. 854, 1043), and Clark and Dr. Rachwal's assessment of plaintiff's "intrusive thoughts and sleep disturbances due to PTSD[]" (Tr. 854), is consistent with plaintiff's case worker's testimony, and CMHA record entries that plaintiff was "having [a] hard time leaving the house[]" (Tr. 719), she was experiencing insomnia (Tr. 712), she had nightmares (Tr. 716), and she was hearing voices. (Tr. 869).

Similarly, in the Mental Impairment Questionnaire completed by Dr. Chadha, Dr. Chadha opined that plaintiff has bipolar syndrome, intense and unstable interpersonal relationships and impulsive behavior, hyperactivity, emotional lability, flight of ideas, manic syndrome, pressure of speech, easy distractibility, and sleep disturbance. (Tr. 1039). In the CRT treatment notes from March 13, 2014, Dr. Chadha noted that plaintiff exhibited "classic[]" symptoms of a manic state, and her speech was pressured with a "flight of ideas, poor concentration, . . . excitab[ility], [and] suspicio[n] of friends' motives." (Tr. 1036). Similarly, on April 28, 2014, Dr. Chadha noted that plaintiff's mood was "evidenced by difficulties with periods of high energy, racing thoughts, difficulties sitting still, depression,

---

[20]In a report from a state-agency consultant, as far back as 2006, it was noted that plaintiff's mother reported that plaintiff "spends a lot of time sleeping due to depression." (Tr. 470).

anxiety, and difficulty concentrating." (Tr. 1032). The next day, he noted that plaintiff was still feeling hyper, restless, and unable to concentrate. (Tr. 1031). Thus, Dr. Chadha's opinion, to which the ALJ assigned "lesser weight" on grounds that it was not consistent with the underlying treatment records (Tr. 21, 26[21]), is, in fact, consistent with substantial evidence in the records, including the records from the CRT, and with the CMHA records discussed above.[22]

While the ALJ appropriately noted that plaintiff improved when medication compliant (see Tr. 23, 26; see Tr. 1035 ("doing much better on the medications[,]" mood was "calmer, becoming productive[]"); Tr. 1029 (doing better on Buspar, was less anxious and excitable)), the ALJ ignored Dr. Chadha's finding that even on medication, plaintiff was "still struggling with chronic mental health issues" (Tr. 1027-29), and while her "medications [were] assisting to manage them[,]" she had "ongoing problems with high energy, racing thoughts, difficulties sitting still, depression, anxiety, and difficulty concentrating." (Tr. 1027).

Similarly, the records from CMHA also reveal that while at times plaintiff reported improvement on her medications (see Tr. 730), at the same time, she continued to "hav[e] [a] hard time[]" (Tr. 729), she continued to experience anxiety, would ruminate, and was "overwhelmed by simple decisions[.]" (Tr. 728; see also Tr. 722 (Geodon is "really help[ing]

---

[21]The ALJ erroneously referred to him as "Dr. Mohinder[,]" which is his first name. (Tr. 26). The ALJ also mentioned having given "some consideration" to the opinion of Dr. David Ketner, described as one of plaintiff's "lead treating clinician" at CRT. (Id.). Although Dr. Ketner was listed as plaintiff's "Lead Clinician" in her initial evaluation on April 14, 2014 (Tr. 1027-28, 1032-33), all her other medical reports from CRT were signed by Dr. Chadha. (Tr. 1029–31, 1034-43).

[22]This is also largely consistent with Dr. Cudrin's report in which he noted that plaintiff was "an emotionally fragile woman who cried frequently as she talked about her history[]" (Tr. 534), plaintiff "exuded depressive feelings" and reported that she does not want to be out in public (Tr. 535), and plaintiff reported frequent panic attacks with hyperventilation, loss of breath, and feelings like she was spinning. (Id.)

[with] the anxiety[,]" but her "social anxiety is out of control[.]"); see Tr. 708, 710 (new medications were working "really well[]" but three weeks later reported feeling anxious, paranoid, and "worsening of panic.")).[23] Additionally, after almost two years of treatment at CMHA, Clark noted that plaintiff's anxiety still needed to be addressed with the goal of "[r]educ[ing] [the] overall frequency, intensity, and duration of the anxiety so that [plaintiff's] daily functioning is not impaired." (Tr. 857; see Tr. 855-58). "'It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination.'" Beckers, 38 F. Supp. 3d at 374-75, quoting Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004).

The ALJ did not adequately explain, with supporting citations to the medical record, why he rejected plaintiff's treating providers' opinions in favor of the opinions of the non-examining and consultative examining physicians' reports. (Tr. 21, 24-26).  Considering the consistency of these records, the duration of her treating relationship with CMHA, and the involvement of her treating psychiatrist in her consistent treatment and as a co-signer of the opinion rejected by the ALJ, "it was inappropriate for the ALJ to summarily reject these opinions without adequate explanation." Becker, 38 F. Supp. 3d at 374.

In his decision, the ALJ assigned "great weight" to the opinion of Dr. Fuess, a non-examining consultant (Tr. 20-21; see also Tr. 25), gave "substantial weight" to the opinions of consultative examiners Drs. Cudrin and Hillbrand (Tr. 21; see also Tr. 24), "generally adopted" the opinion of Dr. Schumacher, a non-examining consultant (Tr. 21; see Tr. 25), and assigned "great weight" to the opinion of Drs. Kogan and Kaplan, both non-examining

─────────────────────

[23]This is consistent with plaintiff's own testimony that she takes medication (see Tr. 1056-57), but she described herself as "still having trouble completing any of [her] daily goals[,]" and "still deteriorating[.]"  (Tr. 1056).

33

consultants. (Tr. 24).

The ALJ assigned "substantial weight" to the opinions of Drs. Cudrin and Hillbrand "due to their areas of expertise and the consistency of the mental status results with other psychiatric evidence of record[]" (Tr. 24), which evidence presumably does not include the voluminous treating records discussed above. The Second Circuit has "cautioned, [that] 'ALJs should not rely heavily on the findings of consultative physicians after a single examination.'" Domm, 579 F. App'x at 28, quoting Selian, 708 F.3d at 419 (additional citation omitted).   "This is so because 'consultative exams are often brief, are generally performed without the benefit or review of a claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" Lumpkin v. Colvin, No. 12 CV 1817 (DJS), 2014 WL 4065651, at *9 (D. Conn. Aug. 13, 2014), quoting Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013). When an ALJ relies on "one-time consultative reports and fail[s] to address substantial additional evidence in the record[,]" as discussed above, Douglass v. Astrue, 496 F. App'x 154, 157 (2d Cir.2012)(summary order)(citation omitted), the ALJ "fail[s] to set forth the 'crucial factors' . . . 'with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence.'" Id., quoting Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). This is precisely what has occurred in this case.

Moreover, the "great weight" assigned to the non-examining consultants (Tr. 20-21, 24-25) is problematic in this case.  While "the ALJ was entitled to consider these opinions pursuant to 20 C.F.R. § 416.912(b)(6)[,]" the "'general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.'"  Beckers, 38 F. Supp. 3d at 374, quoting Vargas v. Sullivan,

898 F.2d 293, 295 (2d Cir. 1990)(additional internal quotations omitted).  This is particularly true "[i]n the context of a psychiatric disability diagnosis[,]" such as in this case.  Id. (internal quotations & citation omitted). In such a case, "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." Id. (internal quotations & citation omitted).

Additionally, not only did the ALJ err in concluding that plaintiff's treating providers' opinions were not consistent with their treating records and thus were not entitled to any weight (see Tr. 21 ("I did not adopt the opinions [of plaintiff's treating sources.]")), the ALJ erred in rejecting such opinions on the basis that they "were not supported by [the GAF] scores[]" that the treating sources assigned.  (Id.).  The DSM-V eliminates the use of GAF scores entirely, and plaintiff's and the ALJ's emphasis thereon is misplaced. See Corporan v. Comm'r of Soc. Sec., No. 12 CV 6704 (JPO), 2015 WL 321832, at *12, n.9 (S.D.N.Y. Jan. 23, 2015)("In addition, before the DSM-V abandoned the GAF scale, the SSA declined to endorse GAF scores for 'use in the Social Security and SSI disability programs' because GAF scores have no 'direct correlation to the severity requirements in [the SSA's] mental disorders listings.'"), quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000)(additional citations omitted).

Accordingly, this case is remanded for further consideration of  the opinions and treatment records in accordance with the treating physician rule and SSR 06-03p, and an explanation as to the weight assigned to all of the treating source opinions.

B.  OTHER ARGUMENTS

35

In light of the conclusions reached above, the Court need not address plaintiff's remaining arguments as the outcome of each of the remaining arguments is contingent on the proper application of the treating physician rule and a thorough consideration of the treating providers' records.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse the Decision (Dkt. #16) is <u>granted in part</u>, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is <u>denied</u>.

Dated at New Haven, Connecticut, this 7th day of March 2016.


                                    /s/ Joan G. Margolis USMJ
                                    Joan Glazer Margolis
                                    United States Magistrate Judge

36